# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION AT LAFAYETTE

| | |
|---|---|
| EMERGENCY SERVICES BILLING ) <br> CORPORATION, INC., Individually ) <br> and as Agent for WESTVILLE ) <br> VOLUNTEER FIRE DEPARTMENT, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> ALLSTATE INSURANCE COMPANY, ) <br> MICHAEL BAKER, PROGRESSIVE ) <br> INSURANCE COMPANY, FRANK DUBCZAK, ) <br> DAVID PENTON, STATE FARM INSURANCE ) <br> COMPANY, and JUAN JOSE GOMEZ ) <br> HERNANDEZ, ) <br> ) <br> Defendants. ) <br> _____ ) <br> ) <br> ALLSTATE INSURANCE COMPANY and ) <br> MICHAEL BAKER, ) <br> ) <br> Counter-Plaintiffs, ) <br> ) <br> vs. ) <br> ) <br> EMERGENCY SERVICES BILLING ) <br> CORPORATION, INC., Individually ) <br> and as Agent for WESTVILLE ) <br> VOLUNTEER FIRE DEPARTMENT, ) <br> ) <br> Counter-Defendant. ) | No: 4:09-cv-45-RL-APR |

## OPINION AND ORDER

This matter is before the Court on: (1) Defendant State Farm Insurance Company's ("State Farm") Motion for Judgment on the Pleadings (DE #18) and Brief in Support (DE #19), to which all Defendants joined (DE #22, 25, 28, 33); (2) Defendant/Counter-

Plaintiff Allstate Insurance Company's ("Allstate") Motion for Preliminary Injunction (DE #44) against Plaintiff/Counter-Defendant Emergency Services Billing Corporation, Inc. ("ESBC"), wherein Allstate wants ESBC ordered to refrain from sending further invoices on contested payments; and (3) Allstate's Motion for Hearing on the Motion for Preliminary Injunction (DE #53).

For the reasons set forth below, the Motion for Judgment on the Pleadings (DE #18) is **GRANTED**, and Plaintiff ESBC's claims are **DISMISSED** in their entirety against all Defendants. As a result, the Motion for Preliminary Injunction (DE #44) and the Motion for a Hearing (DE #53) are **DENIED AS MOOT.**


PROCEDURAL HISTORY

On June 9, 2009, Plaintiff ESBC, as the billing agent for Westville Volunteer Fire Department ("Westville"), filed its complaint pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601, *et seq.* ("CERCLA") (DE #1). ESBC alleges that CERCLA, and "not Indiana law," entitle it to collect payment on behalf of Westville, for the removal of hazardous substances released by motor vehicles which were involved in separate accidents. *Id.* at 3. As such, ESBC seeks a declaration that under CERCLA, payment is due from the drivers involved in the motor vehicle accidents and from the insurers of the involved drivers, namely, Allstate and its

2

insured, Michael Baker ("Baker"); Progressive Insurance Company ("Progressive") and its insureds, Frank Dubczak ("Dubczak") and David Penton ("Penton"); and State Farm and its insured, Juan Jose Gomez Hernandez ("Hernandez") (collectively "Defendants"). *Id*. at 2-3. In response, the Defendants filed their answers and denied the allegations in the complaint (DE #17, 20, 21, 26, 29, 31), and Allstate and Baker filed counter-claims against ESBC seeking injunctive relief and alleging claims for violation of the Fair Debt Collection Practices Act (15 U.S.C. §§ 1692, *et seq*.), unjust enrichment, civil action for recovery of unlawful fee collection, fraud, constructive fraud, and insurance fraud (DE #31, as amended). ESBC responded to the counter-claims and denied the same (DE #37).

BACKGROUND

The parties do not dispute the facts of this case. (Plf.'s Resp. 1-2; Defs.' Reply 1, 3). In fact, there is but one legal issue presented to the Court, the outcome of which will determine whether the case survives the Judgment on the Pleadings Motion. The issue presented is whether the motor vehicles involved in the accidents constitute "consumer products in consumer use" within the meaning of CERCLA's exception. *See infra* pp. 7-18. If the motor vehicles fall within the exception, then they are not "facilities" as defined by the statute, and CERCLA removal expenses are not

recoverable by ESBC. *Id*. In order to make the determination, the Court relies on the following uncontested facts surrounding each motor vehicle accident.

On June 18 and August 17, 2008, Dubczak and Penton were driving their personal vehicles for personal reasons and were involved in separate motor vehicle accidents. (Complaint, DE #1 at 2; Answers, DE #26, 29; Joinder Notice, DE #25, 28 (joining Defs.' Mot. for Judgment, DE# 18, 19)). Westville responded to each accident which presented the potential of a fire and the release, or potential release, of hazardous materials into the air. (Complaint, DE #1 at 2-3). Westville provided traffic control, assessed the potential release of hazardous materials into the air, and incurred expenses for responding to the accidents. *Id*. On behalf of Westville, ESBC prepared invoices for payment of Westville's removal services and sent them to the insurer, Progressive. (Complaint, DE #1 at 3; Answers, DE #26, 29 at 5). The invoices remain unpaid. *Id*.

On September 27, 2008, Baker's son was involved in a motorcycle accident. (Complaint, DE #1 at 2; Answer, DE #31 at 3; Joinder Notice, DE #22 (joining Defs.' Mot. for Judgment, DE# 18, 19)). Westville again responded to the accident and provided similar services to protect against the release of hazardous materials into the air. (Complaint, DE #1 at 2-3; Answer, DE #31 at 4). Because Baker was the owner of the motorcycle which was

4

insured by Allstate, ESBC sent Baker and Allstate an invoice for payment of Westville's removal services. (Complaint, DE #1 at 3; Answer, DE #31 at 2, 4-5). The invoice still remains unpaid. *Id*.

On December 22, 2008, Hernandez was driving his wife's private passenger 2002 Suzuki Vitara from his home in Illinois to meet his wife in Florida, when he was involved in an accident. (Complaint, DE #1 at 2; Answers, DE #17, 21 at 2-3; Joinder Notice, DE #33 (joining Defs.' Mot. for Judgment, DE# 18, 19); Defs.' Br. 1; Plf.'s Resp. 1; Defs.' Reply 1-3). Westville again responded and provided the necessary removal services. (Complaint, DE #1 at 2-3; Answer, DE #17 at 3; Defs.' Br. 1; Plf.'s Resp. 1; Defs.' Reply 2-3). As the insurer of the Suzuki, State Farm received ESBC's invoice for payment of Westville's removal services, but did not pay the full charges reflected in the invoice. (Complaint, DE #1 at 3; Answers, DE #17, 21 at 4; Defs.' Br. 1-2; Plf.'s Resp. 1-2; Defs.' Reply 2-3).

With four invoices remaining unpaid, ESBC seeks a declaration that it is entitled to recoup Westville's removal expenses from Defendants, pursuant to CERCLA. (Complaint, DE #1 at 3).

RULE 12(c) Legal Standard

A party is permitted under Rule 12(c) to move for judgment on the pleadings after the parties have filed the complaint and the answer. Fed. R. Civ. P. 12(c); *N. Ind. Gun & Outdoor Shows, Inc. v.*

5

*City of South Bend,* 163 F.3d 449, 452 (7th Cir. 1998). A motion for judgment on the pleadings "under Rule 12(c) is reviewed under the same standard as a motion to dismiss under 12(b): the motion is not granted unless it appears beyond doubt that the plaintiff can prove no facts sufficient to support his claim for relief, and the facts in the complaint are viewed in the light most favorable to the non-moving party." *Flenner v. Sheahan,* 107 F.3d 459, 461 (7th Cir. 1997). The court, in ruling on a motion for judgment on the pleadings, must "accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Forseth v. Vill. of Sussex,* 199 F.3d 363, 368 (7th Cir. 2000). A court may rule on a judgment on the pleadings under Rule 12(c) based upon a review of the pleadings alone, which include the complaint, the answer, and any written instruments attached as exhibits. *N. Ind. Gun*, 163 F.3d. at 452-53.

DISCUSSION: CERCLA

In 1980, Congress enacted CERCLA in response to growing concern over the possible effects of hazardous waste sites on public health and the environment.[1] Through CERCLA, Congress intended to "provide for liability, compensation, cleanup, and emergency response for hazardous substances released into the

---

[1] Patricia Reid, *Interpretation of the Consumer Products Exception in The Definition of "Facility" Under CERCLA*, 21 J. Legis. 141, 141 (1995).

6

environment and the cleanup of inactive hazardous waste disposal sites."[2] Congress further intended to immediately provide the federal government with the tools necessary for prompt and effective response to the problems of national magnitude resulting from hazardous waste disposal; and, it intended that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created.[3] *See Uniroyal Chem. Co., Inc. v. Deltech Corp.*, 160 F.3d 238, 246-48 (5th Cir. 1998) (summarizing CERCLA's legislative history).

Therefore, CERCLA imposes liability for "response costs" (the costs of eliminating an environmental hazard) on the "owner and operator of a . . . facility" from which a hazardous substance has been released. 42 U.S.C. § 9607(a)(1)-(4); *Amcast Indus. Corp. v. Detrex Corp.*, 2 F.3d 746, 748 (7th Cir. 1993); *see also Envtl. Transp. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 506 (7th Cir. 1992) (in order to establish a *prima facie* case for a private cost recovery action under CERCLA, a plaintiff must show (1) that the

---

[2]*Id*. (citing Comprehensive Environmental Response, Compensation, and Liability Act of 1980, Pub. L. No. 96-510, 94 Stat. 2767 (Dec. 11, 1980) (codified as amended at 42 U.S.C. §§ 9601-9675 (1988))).

[3]Christopher Daniel, *Posner reigns in CERCLA: Amcast Industrial Corp. & Elkhart Products Corp. v. Detrex Corp.*, 9 J. Nat. Resources & Envtl. L. 531, 532 (1994) (citations omitted); S. Rep. No. 848 (1980); H.R. Rep. No. 96-1016(I), *reprinted in* 1980 U.S.C.C.A.N. 6119.

site in question is a "facility" under § 9601(9); (2) that the defendant is the "responsible person" for the spill; (3) that the release or threatened release of a hazardous substance occurred; and (4) that the release or threatened release caused the plaintiff to incur response costs). The only issue raised in the Defendants' Motion for Judgment on the Pleadings concerns the first element, that is, whether the motor vehicles involved in the present circumstances constitute facilities pursuant to § 9601(9). *See Uniroyal*, 160 F.3d at 243 ("the existence of a CERCLA 'facility' is an essential element of a CERCLA claim," and if the consumer products exception is "found to be applicable, it has the effect of removing a case from the scope of CERCLA liability").

"Facility" is broadly defined as "(A) any building, structure, installation, equipment, pipe or pipeline . . ., well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, *motor vehicle*, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9) (emphasis added). The statutory definition of facility excludes, however, "any consumer product in consumer use" (hereinafter "consumer products exception"). *Id*. Yet, Congress did not include a definition of "consumer product" or discuss the consumer products exception to any significant degree in adopting the language, and federal courts have split over the meaning which Congress intended

8

in § 9601(9).[4]

In a case of first impression, the Seventh Circuit resolved the breadth of the consumer products exception by holding that the definition of "facility" is to be read literally. *Amcast Indus. Corp. v. Detrex Corp.*, 2 F.3d 746, 750 (7th Cir. 1993). Applying this interpretation, the Seventh Circuit decided that "[t]he only consumer product exempted by the statute is the consumer product that is a facility, . . . . [thus] [t]he exception is for facilities that *are* consumer products in consumer use, not for consumer products contained in facilities." *Id.* (emphasis in original).

As such, reading the consumer products exception literally as directed in *Amcast*, a two-part test seemingly emerges: (1) whether the object from which the leak/spill emanates is a facility as defined by the statue; and (2) whether the object from which the leak/spill emanates is a "consumer product in consumer use."[5] Clearly, the first part of the test is met in this case because the term "motor vehicle" is explicitly included in CERCLA's definition of facility. 42 U.S.C. § 9601(9)(A) ("The term 'facility' means (A)

---

[4]Reid, *supra* note 1, at 141-42 ("Numerous terms in the statute suffer for lack of clarity and explanation."); Daniel, *supra* note 3, at 532 ("Despite Congressional intent, CERCLA acquired a well-deserved notoriety for vaguely-drafted provisions and an indefinite, if not contradictory, legislative history.").

[5]Daniel, *supra* note 3, at 544 (citing 42 U.S.C. § 9601(9) (1988)).

9

any . . . motor vehicle"). Thus, the Court must next determine the meaning of the consumer products exception and decide if the motor vehicles involved in the accidents (to which Westville responded and ESBC seeks payment for) constitute consumer products in consumer use.

Defendants argue that the motor vehicles at issue here are "consumer products in consumer use," and thus, are not facilities within the meaning of CERCLA. (Defs.' Br. 4-7; Defs.' Reply 4-7). ESBC argues the opposite, asserting that "negligently operated motor vehicles involved in motor vehicle accidents are not 'consumer products in consumer use,' [and] they should be defined as a 'facility' under CERCLA."[6] (Complaint, DE #1 at 2-3; Plf.'s Resp. 3). The parties acknowledge, as does this Court, that no court has squarely addressed the issue of whether a private

---

[6]As the master of its complaint, ESBC only contends that the motor vehicles constitute facilities. *See La.-Pac. Corp. v. Beazer Materials & Services, Inc.*, 811 F.Supp. 1421, 1431 (E.D.Cal. 1993) ("As the master of its complaint, [Plaintiff] has the discretion to formulate the legal theories on which it will base its claims. Here . . .[Plaintiff] alleges that [Defendant] was the owner or operator of a facility [a sawmill and/or landfill sites] from which there was a release which caused the incurrence of response costs."). ESBC has not, and does not, contend that the road-sites upon which the hazardous substances came to be located are considered "facilities" within the meaning of CERCLA. *See e.g.*, *United States v. Ward*, 618 F.Supp. 884, (D.C.N.C. 1985) (the definition of a facility is broad enough to encompass the state-owned roadside sites where PCBs were sprayed, as the definition includes virtually any place at which hazardous wastes have been dumped, or otherwise disposed of).

passenger automobile constitutes a consumer product.[7] (Defs.' Br. 6; Plf.'s Resp. 3).

As in all statutory construction cases, this Court is required to first look to the language of the statue itself to determine if it provides a clear answer to the meaning of the words in question. *United States v. Miscellaneous Firearms*, 376 F.3d 709, 712 (7th Cir. 2004); *Firstar Bank, N.A. v. Faul*, 253 F.3d 982, 987 (7th Cir. 2001). Because "consumer product" is not defined by CERCLA, the Court starts with the assumption that Congress intended the words to have their ordinary meaning. *See Faul,* 253 F.3d at 987; *see also Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253-54 (1992) (when interpreting statutory language, the court "must presume that a legislature says in a statute what it means and means in a statute what it says there.") (citations omitted). When the statutory language is unambiguous, "this first canon is also the last: 'judicial inquiry is complete.'" *Germain,* 503 U.S. at 254 (quoting *Rubin v. United States,* 449 U.S. 424, 430 (1981)). The court may look beyond a statute's express language to effectuate Congressional intent only in two situations: (1) where the statutory language is ambiguous; or (2) where a literal interpretation would thwart the purpose of the overall statutory

---

[7]*See e.g.*, William B. Johnson, Annotation, *What constitutes "facility" within meaning of § 101(9) of the Comprehensive, Environmental Response, Compensation, and Liability Act (CERCLA) (42 U.S.C. § 9601(9))*, 147 A.L.R. Fed. 469 (1998).

11

scheme or lead to an absurd result. *United States v. Tex-Tow, Inc.*, 589 F.2d 1310, 1313 (7th Cir. 1978).

The primary definition of "consumer product" is "[a]n item of personal property that is distributed in commerce and is normally used for personal, family, or household purposes. 15 U.S.C.A. § 2301(1)." Black's Law Dictionary, 359 (9th ed. 2009). As incorporated within the dictionary definition, the Magnuson-Moss Warranty Act defines consumer product, in relevant part, as "any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes." 15 U.S.C. § 2301(1).

The definition of consumer product provides the assistance needed here. Clearly, a personally owned vehicle, or a "an instrument of transportation or conveyance," Black's Law Dictionary, 1693 (9th ed. 2009), is an item of tangible personal property distributed in commerce, and, when normally used for personal purposes, it fits within the ordinary meaning of "consumer product." *See Waypoint Aviation Services, Inc. v. Sandel Avionics, Inc.*, 469 F.3d 1071, 1072 (7th Cir. 2006) (in applying the Magnuson-Moss Warranty Act to consumer products the court noted that "personal cars are consumer products even though 60-passenger busses are not, single-engine planes used for personal transport or recreation may be consumer products even though Antonov 225s and skycrane helicopters are not"); *see also Uniroyal*, 160 F.3d at 257

(concluding that CERCLA's 'consumer product in consumer use' exception "means any good normally used for personal, family, or household purposes, which was being used in that manner when the subject release occurred," and thus, did not include the tanker truck nor trucking terminal involved in the spill of hazardous substances).

ESBC directs this Court's attention to a different statute, the Consumer Product Safety Act, for purposes of determining which definition of "consumer product" should be applied here. The Consumer Product Safety Act similarly states that the term "consumer product" means:

> [A]ny article, or component part thereof, produced or distributed (i) for sale to a consumer for use in or around a permanent or temporary household or residence, a school, in recreation, or otherwise, or (ii) for the personal use, consumption or enjoyment of a consumer in or around a permanent or temporary household or residence, a school, in recreation, or otherwise.

15 U.S.C. § 2052(a)(5). Per this definition, the motor vehicles at issue would still be deemed consumer products.

However, ESBC believes that the Court should also consider the exception that is found within the definition, and apply it to this case. 15 U.S.C. § 2052(a)(5)(C). The exception states that motor vehicles, as defined by the National Traffic and Motor Vehicle Safety Act, 49 U.S.C. § 30102(a)(6), are not consumer products. *Id*. Notably, the Consumer Product Safety Act excludes more than just motor vehicles from the definition of consumer product. 15 U.S.C.

13

§ 2052(a)(5)(A)-(I) (listing certain separately regulated motor vehicle equipment, pesticides, firearms, aircraft, boats, vessels, drugs, cosmetics, and food). To follow ESBC's logic, after explicitly including "motor vehicles" but excluding "consumer products in consumer use" from CERCLA's definition of facility, the legislature then impliedly exempted "motor vehicles" from the definition of "consumer products" merely because the Consumer Product Safety Act does so.

Yet finding that motor vehicles can never be "consumer products" within the meaning of CERCLA, solely because the Consumer Product Safety Act excludes motor vehicles from its regulatory reach, defies the plain language of CERCLA. *See Firstar*, 253 F.3d at 990 (the interpretive principle that "identical words used in different parts of the same act are intended to have the same meaning" does not apply here because the provisions interpreted were located in different acts) (internal citations omitted). Inferring an unwritten exclusion for motor vehicles (within CERCLA's consumer products exception) would mean that no motor vehicle (or any other object identified in § 2052(a)(5)(A)-(I)), could ever be considered a consumer product under CERCLA, regardless of its use. This interpretation does not coincide with CERCLA's express language, which states without exception, that the term "facility . . . does not include any consumer product in consumer use." 42 U.S.C. § 9601(9). If Congress wanted to exclude

motor vehicles from CERCLA's consumer products exception, as it did from the Consumer Product Safety Act's definition of consumer product, it knew how to do so.

Moreover, keeping motor vehicles out of the restrictions imposed by the Consumer Product Safety Act avoided the possibility of having conflicting safety standards enacted for motor vehicles. *Compare* 15 U.S.C. § 2051(b)(3) (the purpose of the Consumer Product Safety Act is to develop uniform *safety standards for consumer products*, which does not include motor vehicles), *with* 49 U.S.C. § 30101(1) (the purpose of the National Traffic and Motor Vehicle Safety Act is to reduce traffic accidents by prescribing *safety standards for motor vehicles*[8]). Excluding motor vehicles from CERCLA's consumer products exception would serve no such similar purpose. *See Firstar*, 253 F.3d at 990 (before reading acts together such that ambiguities in one may be resolved by reference to the other, "courts should take a hard look to ensure that the purposes and subjects of the acts are in fact similar.").

In addition, applying the literal interpretation of the consumer products exception does not thwart the purpose of the overall statutory scheme or lead to an absurd result. CERCLA's history shows that the consumer products exception was intended to

---

[8]The National Traffic and Motor Vehicle Safety Act defines "motor vehicle" as a "vehicle driven or drawn by mechanical power and manufactured primarily for use on public streets, roads and highways, but does not include a vehicle operated only on a rail line." 49 U.S.C. § 30102(a)(6).

15

prevent consumers, whether individuals, business firms or other institutions, *see Amcast*, 2 F.3d at 750 (citing *Dayton Indep. Sch. Dist. v. U.S. Mineral Products, Co.*, 906 F.2d 1059, 1065-66 (5th Cir. 1990)), from being subjected to strict liability under CERCLA for a "release" from a product in consumer use. *See* Lewis Barr, *CERCLA Made Simple: An Analysis of the Cases Under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980*, 45 Bus. Law. 923, 961-62 (1990). Senator Cannon, who sponsored the amendment which became the consumer products exception, expressed his concern as follows:

> [The bill] contains no exclusion for consumer products. Therefore, it has been suggested that this would mean that an individual consumer is subject to strict, joint and several liability for a "release" from any product that contains one of the numerous hazardous substances listed on pages 24 to 28 of the Senate Environment and Public Works Committee report. While staff has been informed that such a result was not intended, the term "facility" as it is presently defined would include consumer products, and the report does not in any way clarify that this term does not include consumer products. An amendment will be offered to clarify this matter.

*Id*. (citing 126 Cong. Rec. S12917 (daily ed. Sept. 18, 1980) (statement of Sen. Cannon)). A few days later, the same Senator rephrased this purpose in even clearer terms: "[O]ne of my amendments would exclude consumer products from the definition of 'facility,' thus precluding any unintended application of notification requirements and liability provisions to consumers." *Id*. (citing 126 Cong. Rec. S13364 (daily ed. Sept. 24, 1980)

16

(statement of Sen. Cannon)).

It is clear that these comments also support the application of the consumer products exception to the use of private passenger automobiles being used normally for personal reasons, as was the case with these Defendants.

A final issue, not raised by the parties, is whether the Environmental Protection Agency ("EPA") has interpreted CERCLA's consumer products exception. It is a relevant concern because, as the agency charged with its administration, courts defer to the EPA's reasonable construction of CERCLA absent a clearly expressed legislative purpose to the contrary. *Uniroyal*, 160 F.3d at 249-50 (citing *Chevron, U.S.A. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984)). Indeed, the EPA's interpretation of CERCLA is given controlling weight unless it is plainly erroneous or inconsistent with the regulation. *Sierra Club v. Franklin County Power of Ill., LLC*, 546 F.3d 918, 930 n.4 (7th Cir. 2008) (noting that "Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law, even one about which 'Congress did not actually have an intent' as to a particular result.") (citations omitted).

Shortly after CERCLA's enactment, the EPA proposed a new rule, stating in relevant part:

> The definition of "facility" excludes consumer products in consumer use. Releases from consumer products by

17

> consumers, therefore, are not releases from a facility into the environment and, consequently, do not have to be reported. Although the Act does not define the term "consumer product," the Consumer Product Safety Act defines that term as, generally, any article sold to a consumer for the person's use, consumption or enjoyment in or around a household, residence, school, in recreation, or otherwise (15 U.S.C. 2052). This definition will apply for notification under CERCLA.

Notification Requirements; Reportable Quantity Adjustments, 48 Fed. Reg. 23552-01, 23553 (May 25, 1983) (to be codified at 40 C.F.R. pt. 302). The EPA never referred to the specific exceptions found in the Consumer Product Safety Act, 15 U.S.C. 2052(a)(5)(A)-(I), as ESBC requests this Court to apply. Thereafter, the EPA enacted a final rule which stated that "consumer product shall have the meaning stated in 15 U.S.C. 2052." Notification Requirements; Reportable Quantity Adjustments, 50 Fed. Reg. 13456-01, 13474 (April 4, 1985); EPA Definitions, 40 C.F.R. § 302.3 (1985). Again, no reference was made by the EPA to the statute's exceptions to consumer products.

Despite subsequent amendments to CERCLA, *see e.g.,* Pub. L. No. 99-499, 100 Stat. 1613 (1986), no definition of "consumer product in consumer use" has been provided by the legislature, but the EPA maintains that "consumer product shall have the meaning stated in 15 U.S.C. 2052." 40 C.F.R. § 302.3 (2009); *see Firstar*, 253 F.3d at 988 ("The courts presume that Congress will use clear language if it intends to alter an established understanding about what a law means; if Congress fails to do so, courts presume that the new

statute has the same effect as the older version.") (citations omitted). No reason has been provided for why the Court should ignore the EPA's guidance on this issue, whose interpretation of the consumer products exception also alines with the plain meaning of CERCLA. *See* Reportable Quantity Adjustment–Radionuclides, 52 Fed. Reg. 8172, 8172 n. 1 (March 16, 1987) (to be codified at 40 C.F.R. pt. 302) (defining releases subject to the notice requirement, the EPA noted that the definition of facility would exclude from notification requirements the release of radionuclides from goods such as watches and smoke detectors when in consumer use because the consumer products exception would apply). As initiated by the EPA in 1983, the Court finds that "consumer product in consumer use" refers to its ordinary meaning, which includes the private passenger motor vehicles specifically at issue in this case being used for personal purposes.

Because ESBC is unable to establish a *prima facie* case for a private cost recovery action under CERCLA, the dismissal of this lawsuit is proper. *Smith v. Duffey*, 576 F.3d 336, 340 (7th Cir. 2009) (noting that the case has no merit, which is enough to justify, under any reasonable interpretation of Rule 12(b)(6), the dismissal of the suit).

CONCLUSION

The parties do not dispute that Defendants Baker, Dubczak,

19

Penton, and Hernandez were using their private passenger motor vehicles for personal purposes when the accidents at issue occurred. Within the precise facts of this case, the Court finds that these particular motor vehicles meet the ordinary definition of "consumer products in consumer use," in that they are personal property distributed in commerce and used for personal, family, or household purposes. Because the motor vehicles meet CERCLA's consumer products exception, ESBC is unable to show that the release of hazardous materials came from a "facility" within the meaning of CERCLA. As such, ESBC cannot recover the response costs incurred by Westville at the accident sites under the auspices of CERCLA.

Accordingly, the Motion for Judgment on the Pleadings (DE #18) is **GRANTED**, and Plaintiff ESBC's claims are **DISMISSED** in their entirety against all Defendants. As a result, the Motion for Preliminary Injunction (DE #44) and the Motion for a Hearing (DE #53) are **DENIED AS MOOT**. Allstate and Michael Baker are afforded twenty (20) days from the date of this Order to file a status report or dismissal documents regarding their counter-claims alleged against ESBC.

**DATED: March 19, 2010**          /s/RUDY LOZANO, Judge
                                                           **United States District Court**